UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 12-295(2) (PAM/AJB)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **GOVERNMENT'S POSITION ON** |
| v. ) | **SENTENCING** |
| ) | |
| JULIE ANN CAMPANA, ) | |
| ) | |
| Defendant. ) | |

The United States, by its attorneys, B. Todd Jones, United States Attorney for the District of Minnesota, and Amber M. Brennan and Allen A. Slaughter, Assistant United States Attorneys, hereby files this Position on Sentencing in support of its request that the Court sentence Defendant Julie Ann Campana to a term of imprisonment of 57 months, the top of the range which the parties agreed should apply in this case.

## I. INTRODUCTION

Defendant is before the Court for sentencing after pleading guilty to Count 1 of the Indictment as it is alleged against her. Count 1 of the Indictment charges Defendant with aiding and abetting interference with commerce by robbery on October 29, 2012, in violation of 18 U.S.C. §§ 2 and 1951 (the "Hobbs Act"). Both Defendant and the Government agreed to advocate for a sentence within the range of 46-57 months. (Plea Agreement and Sentencing Stipulations, hereinafter "PA&SS", ¶6). Given Defendant's offense conduct, her criminal history, the significant concessions made by the

Government in reaching the Plea Agreement, and the unique circumstances in this case more fully set forth below, a sentence at the high end of the range between 46-57 months is just punishment.

## II.     BACKGROUND FACTS

### A. Offense Conduct

Defendant's offense conduct is set forth in detail in both the Plea Agreement and the Presentence Investigation Report ("PSR") prepared by pretrial services/probation. (PA&SS ¶2; PSR ¶¶9-12).  Below is a summary of the facts the Government believes are most relevant for sentencing purposes.

In the early morning hours of October 29, 2012, Defendant was with co-defendant Eric Wade Forcier.  Defendant went inside America's Best Hotel and Suites in Northfield, Minnesota, and asked several questions of the night manager, including whether the night manager was alone and how he felt about working alone.  During this time, Forcier waited for Defendant in Defendant's Pontiac Grand Prix, which was parked in an adjacent parking lot.  Defendant then returned to the Grand Prix and the two drove away.  Defendant and Forcier returned shortly thereafter for the purpose of robbing the America's Best night manager.  Defendant then waited as a lookout and get-away driver while Forcier entered America's Best - wearing a Halloween mask - for the purpose of robbing the hotel.  Forcier pointed a handgun at the night manager and demanded money from the cash register and hotel safe.  Forcier stole $114.00 in cash and coin from the

cash register and ran back to Defendant's vehicle. Defendant then drove them away from the hotel.

Defendant admits that she knew Forcier planned to rob America's Best while brandishing or otherwise using a firearm, and that she facilitated that robbery. Her role was to case the hotel and be the get-away driver.

Shortly after the robbery, the police stopped the Grand Prix. Defendant was driving the vehicle and was arrested, but Forcier had bailed out of the Grand Prix's passenger seat and fled on foot while police were effectuating the stop. Forcier discharged the handgun during his flight from law enforcement officers. He was arrested later that day.

The robbery of America's Best was the fourth robbery Defendant and Forcier had committed in a *two week* period. Defendant admits she participated in the following additional crimes:

(1) On October 15, 2012, Defendant and Forcier robbed a Domino's Pizza store in Apple Valley, Minnesota. Defendant and Forcier drove to Domino's together with the intention of committing a robbery. Forcier entered the store, brandishing a gun, and ordered employees to give him the money from the store's cash register. Defendant waited in the car during the robbery, and served as Forcier's getaway driver when he fled the scene afterward;

(2) On October 18, 2012, Defendant and Forcier robbed a Super America store in Bloomington, Minnesota. Defendant and Forcier drove to the Super America together with the intention of committing a robbery. Forcier entered the store, brandishing a gun, and demanded the employees give him money from the cash register. Defendant waited in the car during the robbery, and served as Forcier's getaway driver when he fled the scene afterward; and

> (3) On October 22, 2012 Defendant and Forcier robbed Eddy's Bar and Grill in Inver Grove Heights. Defendant had started a job at Eddy's the previous week; she had worked only one shift, however during that shift Defendant learned that several hundred dollars in pull tab money was kept in the cash register behind the bar. Defendant and Forcier drove to Eddy's together with the intention of committing a robbery. While Defendant waited outside, Forcier entered the bar at approximately 2:05 a.m., brandishing a gun. Forcier fired a shot into the air and ordered the bar employee to give him the money from the register. Defendant served as Forcier's getaway driver when he fled the scene afterward.

(PSR ¶¶ 13, 14, 16). Defendant has not been charged with these offenses, and she acknowledges them as part of her acceptance of responsibility. (PA&SS ¶ 3).

### B. Defendant's Criminal History

Defendant has one prior felony conviction for possession of marijuana. (PSR ¶ 76).[1] Other than the foregoing, Defendant's criminal history consists primarily of misdemeanor offenses involving driving violations, theft, and alcohol related conduct. (PSR ¶¶ 74-80).

### C. Defendant's Personal History and Relationship With Forcier

Defendant admits she began using alcohol and drugs at the age of 14. She was placed in treatment at age 16 (in 2005) where she was diagnosed with dependence on alcohol, marijuana and methamphetamine. The PSR contains conflicting information about Defendant's chemical use following treatment: at paragraph 106 it states that Defendant was sober for one year following her completion of treatment in 2005, that

---

[1] It appears that Defendant was granted a stay of adjudication of this charge and that it was later dismissed after Defendant satisfactorily completed all of the terms of her probation. (PSR ¶76).

4

living with a family who supervised her behavior and working with a sponsor was effective and worked for a period of "months," and also that she was "clean and sober" for "a few years" after that period of time. (PSR ¶106).  However, Defendant admitted that she smoked marijuana on a "constant" basis between 2003 and 2007, and only stopped in 2007 after the house she was sharing with her boyfriend was raided by police. (PSR ¶103).  Defendant states she began using marijuana again in 2011 and smoked it "daily" until December, 2012, when she submitted urine samples to probation in connection with this case which tested positive for the drug.  (PSR ¶¶103, 108). Additionally, Defendant was arrested for Driving Under the Influence in January, 2012 and convicted of that offense in October, 2012.  (PSR ¶102).

     Defendant was using methamphetamine when she met Forcier in July, 2012.  (PSR ¶94). She admits that they "fed off" of one another:  Defendant supplied the vehicle for Forcier's drug dealing and Forcier supplied Defendant with methamphetamine in quantities much greater than she had ever used in the past.  (PSR ¶94).  Defendant reports that Forcier was verbally and emotionally abusive, then physically abusive, during their four-month relationship (the two were arrested in October, 2012 and Forcier has been in custody since that time).  (PSR ¶94).  The PSR notes that medical records verify one visit to the hospital that Defendant reported to be the result of an assault by Forcier.  (PSR ¶ 97).  The undersigned is also aware that a Taser or stun gun was found in the vehicle that Defendant and Forcier were driving the night of the robbery of America's Best.

Defendant does not claim that Forcier forced her to commit crimes against her will. Rather, she appears to suggest that her relationship with Forcier was unhealthy, abusive, centered around their mutual addictions to methamphetamine, and that she was afraid of Forcier.

Defendant reports being raped on numerous occasions when she was 14 years old (2003), though she has never received counseling to process those events. (PSR¶ 90). Defendant also attempted to commit suicide on two occasions in 2004 and was repeatedly diagnosed with depression and prescribed medication. (PSR ¶99).

## III. ARGUMENT

The Government made multiple meaningful concessions when entering into the Plea Agreement with Defendant. Those concessions provide Defendant with benefits based upon her history and personal circumstances, including the nature of the relationship between Defendant and Forcier. For those reasons, the Court should adopt the parties' agreed upon sentencing range and should sentence Defendant toward the higher end of that range.

### A. The Basis for the Parties' Agreed Upon Range of 46-57 Months

With a criminal history score of three (3) and a base offense level of 28, the PSR properly concludes that Defendant's advisory Guidelines range is 97-121 months in custody. Although this is significantly higher than the range set forth in the Plea Agreement, several factors justify a departure to the agreed upon range.

The parties agreed to advocate for a sentence of 46-57 months, which is the advisory Guidelines range for a person with a criminal history category of one (1) and an adjusted base offense level of 23. This calculation includes an adjusted offense level of 26 minus three levels for acceptance of responsibility. The PSR, on the other hand, calculates Defendant's criminal history category to be three (3) and her adjusted offense level to be 28. Thus, the difference in the ranges contemplated by the Plea Agreement versus the PSR was caused by disparities in both the offense level and Defendant's criminal history category. For the following reasons, the Court should adopt the Guidelines range advocated by the parties.

First, the difference between the offense levels is primarily due to the PSR's consideration of the additional offenses to which Defendant admitted in the Plea Agreement.[2] It is within the discretion of the parties whether or not to include a stipulation regarding a defendant's commission of additional offenses in a Plea Agreement. (*See* U.S.S.G. § 1B1.2(c)). In this case, the Government agreed that to the extent the Court deemed it appropriate to count those additional offenses for purposes of sentencing, any resulting increase to Defendant's offense level should be offset by an

---

[2] There is also a one point difference because the parties applied a six-level increase to the base offense level based upon the belief that a firearm was "otherwise used" during the robbery because Forcier pointed the gun at the hotel employee. It appears the PSR applied a five-level increase, which is applicable when a firearm is "possessed or brandished" as opposed to "otherwise used." (PSR ¶57; U.S.S.G §2B3.1(b)(2)).

7

equal downward departure based on coercion and duress Defendant experienced during her relationship with Forcier. (PA&SS ¶3).

Another difference between the PSR's calculation of the Guidelines range and that contemplated by the parties stems from the parties' inaccurate estimation of Defendant's criminal history category to be a one (1) rather than a three (3) as the PSR ultimately concluded. The Government does not object to the PSR's determination regarding Defendant's criminal history score. However, in this case the PSR concludes, and the Government agrees, that a category three designation overstates the seriousness of Defendant's criminal history. (PSR ¶146).

> B. <u>An Examination Of The 3553(a) Factors Demonstrates That The Court Should Adopt the Parties' Agreed Upon Range And Impose A Sentence At The High End Of That Range</u>

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." <u>Gall v. United States</u>, 552 U.S. 38, 50 (2007). Additionally, under 18 U.S.C. § 3553(a), the Court is required to analyze a number of factors when determining the proper sentence, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," and "the need to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a). In this case, the Court should adopt the parties' agreed upon sentencing range based on the facts and circumstances unique to this case.

Moreover, as set forth below, adopting this range *and* sentencing Defendant to the high end of the range satisfies the goals of Section 3553(a).

    1. <u>History and Characteristics of the Defendant</u>

Although Defendant's criminal history does not foreshadow the type of conduct to which she has admitted in this case – specifically, multiple armed robberies – her long history with drug abuse and the problems resulting from her addiction placed her on a dangerous path. Defendant began using alcohol and drugs (including cocaine, ecstasy, marijuana, and methamphetamine) at age 14.[3] While it appears Defendant has had some periods of sobriety, it is apparent that she has continued to use drugs and alcohol off and on since her youth and that she has continued to be drawn toward a path of drug abuse and crime – a path that resulted in her relationship with Forcier and, together with him, her active participation in a string of armed robberies during October, 2012.

The Government has already recognized Defendant's relative lack of serious criminal history through two substantial concessions: (1) Agreeing to dismiss Count 2 of the Indictment; and (2) foregoing its opportunity to seek a superceding indictment charging Defendant in connection with one or more of the three additional robberies she and Forcier committed.

---

[3] Defendant has reported that she began using methamphetamine after she took a trip with a neighbor to Iowa to visit his (the neighbor's) father who was in prison there. Defendant reports she was introduced to methamphetamine by the people she was staying with and that she was repeatedly raped during the approximately two-week period she stayed there. (PSR ¶90). It is unclear whether the Defendant's use of alcohol and other drugs - which she reports had also begun at age 14 – began before or after the Iowa incident.

Defendant would have faced substantial mandatory sentences if the Government had elected to pursue Count 2 or if it had sought a superceding indictment on just one of the robberies. Count 2 charges Defendant with aiding and abetting the use, carrying, possessing and brandishing of a firearm during and in relation to the crime charged in Count 1, in violation of 18 U.S.C. §§ 2 and 924(c).  If Defendant were convicted of Count 2, she would be subject to a mandatory minimum sentence of 84 months which would run consecutive to any sentence the Court imposed for Count 1. (See PA&SS ¶6). Additionally, Defendant would have faced an additional, consecutive sentence of 25 years for each subsequent conviction for use of a firearm during commission of a crime of violence. See 18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(C)(i) (providing for a mandatory minimum sentence of seven years if a firearm is brandished in relation to a crime of violence, and not less than 25 years imprisonment for a second or subsequent conviction under that section).

In advocating for a sentence at the lower end of the parties' agreed upon range, Defendant will likely emphasize her personal history of abuse, both in general and within her relationship with Forcier, in particular.  The Government recognizes that Defendant's personal history, combined with the dynamics of Defendant's relationship with Forcier, may have influenced her actions to some degree.  However, the Government  already provided Defendant with a concession based upon this factor when it agreed that Defendant's other criminal conduct should not even be considered in calculating

10

Defendant's offense level in this case, something that would normally occur when a Defendant has committed multiple similar crimes but has only pled guilty to one.

Defendant has had some difficult and unfortunate circumstances in her past, however she has also experienced support from her family and has had opportunities to attend school, hold down a job, and undergo substance abuse treatment. Despite these opportunities, Defendant pursued criminal activity as a means to make money and feed her drug habit, and she should be penalized accordingly.

    2. <u>Nature and Circumstances of the Offense</u>

Defendant engaged in a series of intentional acts and choices leading up to the robbery of America's Best on October 29, 2012. Defendant drove to the hotel. She entered the hotel to survey the premises so that she could provide information to Forcier. She asked the night manager whether he was working alone that night. She returned to the vehicle and shared the information she had learned with Forcier. She waited in the Grand Prix – in the driver's seat – while Forcier entered America's Best to commit the robbery. She was Forcier's getaway driver when he exited the hotel.

Forcier entered the hotel knowing that the night manager was working alone. He took advantage of the night manager's isolation. He pointed the gun at the night manager and demanded money.

Defendant's choices and actions caused severe and lasting consequences for her victims. It is reasonable to conclude that being robbed at gunpoint was traumatic for

11

S.W., the night manager who was working at America's Best hotel on October 29. S.W. quit his job shortly after the incident, and he has not responded to the probation officer's efforts to reach him by telephone and U.S. mail. The owner of the hotel provided information that S.W. was afraid for his life during the robbery, and that S.W. had attended counseling following the incident. (PSR ¶23).

Although efforts to reach S.W. were not successful, the probation officer was able to reach some of the victims from Defendant and Forcier's other robberies. The store clerk who was working during the Super America robbery stated that she was fearful when the robbery was happening, she has had intermittent nightmares since the robbery, she is more "on edge" during certain shifts, and that if she had another job opportunity she would leave the Super America job. (PSR ¶22). One of the employees who was present during the Domino's robbery changed shifts the day after the robbery because he no longer felt comfortable working the late night "closing" shift. (PSR ¶21). Another employee who was present during the Domino's robbery stated that it was only his third day on the job, he had never been robbed or threatened with a gun before, and he was "scared" when the gun was pointed at him. (PSR ¶21).

Armed robbery is a violent and serious crime that can have real and devastating consequences for innocent people. The October 29 robbery of America's Best was not the first opportunity Defendant had to consider the implications of what she was about to do – it was her fourth robbery. Defendant had multiple chances over a two week period

to consider the effects of her actions upon those innocent people who happened to be working at the establishment she and Forcier chose to rob, yet she decided to continue on the same path.

Defendant made the choice to terrorize another individual for the sake of her own personal gain. The nature and circumstances of the offense in this case justify a sentence of 57 months, the high end of the parties' agreed upon range.

3. <u>The Need for Deterrence And To Protect The Public</u>

In this case, there is a need for both individualized and general deterrence and to protect the public from Defendant.

Individualized deterrence is that which discourages Defendant from ever committing such a crime again. General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress has specifically made general deterrence an appropriate consideration under 3553(a)(2)(B), [it is] one of the key purposes of sentencing." <u>Ferguson v. United States</u>, 623 F.3d 627, 631-32 (8th Cir. 2010). A sentence of 57 months is an appropriate attempt to deter Defendant from participating in future criminal acts. Although it is a significant sentence, it is not as significant as many others in Defendant's situation would face given the statutory sentencing scheme governing armed robbery. It is less than five years in prison and affords Defendant the opportunity to have a meaningful life after she is released.

A significant sentence would also provide general deterrence to similarly situated persons. United States v. Foy, 617 F.3d 1029, 1037 (8th Cir. 2010); United States v. Keating, 579 F.3d 891, 893 (8th Cir. 2009). Indeed, imposition of anything other than a significant sentence for the type of knowing and intentional conduct Defendant has committed in this case would thwart the statutory goal of general deterrence.

Finally, the type of crime Defendant committed poses a direct and serious threat to public safety. A significant sentence is necessary to protect the public from Defendant.

### III. CONCLUSION

For the reasons set forth above, the Government respectfully asks the Court to adopt the parties' agreed upon range and impose a sentence of 57 months imprisonment.

Dated: July 12, 2013

Respectfully Submitted,

B. TODD JONES
United States Attorney

s/ Amber M. Brennan
BY: AMBER M. BRENNAN
Attorney Id No. 285961
ALLEN A. SLAUGHTER, Jr.
Attorney Id No. 301668
Assistant U.S. Attorneys